IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                           Case No. 15-1230-JWB

$144,780.00 IN UNITED STATES
CURRENCY, more or less,

        Defendant,
and

NATHAN DUCKWORTH,

        Claimant.

**MEMORANDUM AND ORDER**

This action for forfeiture pursuant to 21 U.S.C. § 881(a)(6) came before the court for a bench trial on July 13, 2018. (Doc. 73.) At the close of the evidence, the court took the matter under advisement to permit the parties to submit proposed findings of fact and conclusions of law. Those items have now been filed (Docs. 77, 78) and the court is prepared to rule. For the reasons stated herein, Plaintiff is GRANTED a judgment of forfeiture of the defendant property, and Claimant's claim to the property is DENIED.

**I. Background**

On July 28, 2015, the United States filed a complaint for forfeiture of $144,780 in United States currency. (Doc. 1.) The complaint alleged the money was seized by the Kansas Highway Patrol during a traffic stop of a car driven by Claimant Nathan Duckworth on I-70 in Ellis County, Kansas. Plaintiff contends the money is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6)

because it was intended to be used in an illegal exchange for controlled substances or is proceeds traceable to a violation of the Controlled Substances Act. (Doc. 49 at 3.)

A warrant was issued for arrest of the defendant property. (Doc. 3.) Claimant filed a notice of claim (Doc. 5) and answer to the complaint (Doc. 6), in which he asserted the money was his, that it was legitimately derived from his business and personal savings, and that it was not the proceeds of, or intended to be used in connection with, controlled substances. On November 14, 2016, the Honorable Eric F. Melgren held a hearing on Claimant's motion to suppress evidence (Doc. 24), and orally denied the motion. (Docs. 36, 52 at 80.) On May 3, 2018, the undersigned judge denied Claimant's motion for summary judgment. (Doc. 66.) The court has jurisdiction to hear this forfeiture proceeding pursuant to 28 U.S.C. § 1355(b).

**II. Findings and Analysis**

The following property is subject to forfeiture to the United States, and no property right shall exist in them: all moneys intended to be furnished by any person in exchange for a controlled substance in violation of Subchapter I of the Controlled Substances Act. 21 U.S.C. § 881(a)(6). Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983(c), it is Plaintiff's burden to show by a preponderance of the evidence that forfeiture applies. *United States v. $252,300 in U.S. Currency*, 484 F.3d 1271, 1273 (10th Cir. 2007).

The evidence at trial showed that on May 12, 2015, on I-70 in Ellis County, Kansas, Kansas Highway Patrol Trooper James McCord was on duty when he received a call from dispatch. The dispatcher said a caller reported a westbound black Chevrolet Tahoe with Kansas plates weaving in and out of traffic at a high rate of speed near McCord's location. Shortly thereafter, McCord saw a black Chevy Tahoe with Kansas plates traveling westbound and clocked it on radar going 85 miles per hour in a 75 mile per hour zone. McCord stopped the car, which was driven by

Claimant. There was one other person in the car – a friend of Claimant's named Walter Weathers. Claimant told McCord he was on his way to Denver for a week-long family vacation. McCord determined from a rental agreement that the car had been rented by Claimant on May 8, 2015, from Advantage Rental Car in Kansas City, and that it was due back in Kansas City on May 12, the day of the stop. During the stop, McCord detected an odor of marijuana coming from the Tahoe, and remarked to Claimant that someone had been smoking marijuana in the car. Claimant denied anyone had been smoking marijuana or that there were any drugs in the car.

Based on the smell of marijuana from the vehicle, McCord decided to search the car. During the search, he located a backpack between the driver and passenger seats. The backpack contained two clear, heat-sealed vacuum bags with a large amount of United States currency inside. (Govt. Exh. 1.) When McCord asked how much money was in the bags, Claimant told him it was none of his business. McCord also located what he characterized as marijuana and tobacco "gleanings" on the carpet floor in front of the vehicle's third row of seats. Photographs of the gleanings (Govt. Exhs. 2, 3) support McCord's testimony. McCord is an experienced trooper with training in the visual recognition of marijuana and testified that he recognized marijuana in the vehicle and as shown in the photos. The court finds that testimony, as well as McCord's testimony that he detected an odor of marijuana from the vehicle, to be credible.

Aside from the backpack containing the money, there was no luggage in the vehicle. McCord saw only two shirts and a pair of pants hanging in the rear passenger window. Officers found a total of five cell phones in the car. (Govt. Exh. 5-3.) In his deposition, Claimant stated that three of the cell phones belonged to him. (Govt. Exh. 5 at 43-45.)

Kansas Highway Patrol Trooper Ian Gray and his patrol service dog, Jaxx, are trained and certified as a Narcotic Detection Dog Team. (Govt. Exh. 4.) Jaxx is trained to detect marijuana,

3

heroin, methamphetamine, and cocaine. A few hours after the stop, Gray and Jaxx were called in to Troop D Headquarters to do a "currency screening" on the cash from Claimant's vehicle. The screening was a "blind" test where the cash was removed from its plastic container and hidden from view by a third party. Gray and Jaxx were then brought in to screen the area. Jaxx passively alerted to the money by sitting next to a cardboard box containing the money. Gray testified he had training or experience concerning vacuum-sealed money and that some people use that technique to try to prevent an odor of drugs on money from being detected.[1] The cash was counted and found to be $144,780.00 in United States currency.[2]

At the trial, Claimant conceded he lied to Trooper McCord about going to Denver for a family vacation. He testified he felt the purpose of the trip was none of the Trooper's business, and that if he had disclosed the real purpose or the fact that he had a large amount of cash, the Trooper would have targeted him. After McCord said he smelled marijuana, Claimant testified he thought it was better to "shut[] down and let the law take place." Claimant testified he was on his way to Denver to meet with Ruben Romero and give the money to Romero to invest it in a musical tour that he and Romero had discussed. Claimant said Romero told him he had put together a 12-city

---

[1] The Government additionally presented the testimony of Kansas Highway Patrol Trooper Ryan Wolting, who said that on October 12, 2014, Claimant was a passenger in a rental vehicle being driven by Claimant's wife eastbound on I-70 in Ellsworth County, Kansas. Wolting stopped the vehicle for going 78 in a 75 mile-per-hour zone. Wolting did not believe the explanation of Claimant and his wife, who were both unemployed, that they wanted to get away from home so they had traveled from Kansas City to spend a night in Hays, Kansas, before returning home. Wolting said he searched the vehicle and found nine pounds of marijuana in individual one-pound vacuum-sealed bags, a loaded pistol in the center console, and just over $5,000 in cash in Claimant's pants pocket. Wolting said Claimant claimed responsibility for the items. Wolting arrested Claimant but did not know of the disposition of the charges against him.
    The defense objected to this evidence on relevance grounds and additionally intimated that the search of the vehicle may have been unlawful. The evidence presented at trial here was inconclusive with respect to the lawfulness of the search. Under the circumstances, the court declines to consider evidence of the October 14, 2014, stop in reaching its decision.

[2] Claimant also asserted that the actual amount seized was $147,200. (Doc. 5 at 2.) The evidence at trial did not support this assertion, as the credible evidence showed only the seizure of $144,780. Claimant's counsel asked one witness whether $3,500 was also found in Claimant's pocket, but no evidence indicating the seizure or disposition of such a sum was presented.

tour and needed a total of $600,000 to put it on. Claimant indicated he was one of the investors in the tour. Claimant said it was common in the music business to vacuum-seal money. He said he did not tell his friend, Walter Weathers, about the money in the backpack. Claimant indicated he planned to go to Denver to drop off the money, find out more about what was going on, and drive right back to Kansas City. For reasons discussed later in this opinion, the court finds Claimant's testimony concerning the purpose of his trip is not credible.

Claimant lives in Kansas City, Missouri, with his wife and daughter. Claimant used to work at a chemical company but later got into the promotion business. In 2011, Claimant came out of Chapter 7 bankruptcy with no non-exempt assets. By the end of 2014, Claimant had an entertainment promotion business called "Building Bridges Entertainment, LLC," which was registered in Missouri. Claimant testified that most of the cash in his car came from his entertainment promotion business, in addition to $40,000 loaned to him by an associate in Kansas City named Mustafa Ali.

Mustafa Ali lives in Kansas City and operates a rental car business and a business that sells energy drinks. Claimant was involved with Ali in the energy drink business. Ali testified by deposition that he loaned Claimant $40,000 in cash on May 8, 2015, under an agreement whereby Claimant was to repay him within two months, together with 50% interest ($20,000). (Def. Exh. 603 at 4-5.[3]) Claimant gave him a signed promissory note. (Def. Exh. 605.) Ali testified he had $43,000 in cash at his house at the time, which constituted several years' worth of savings, and he gave Claimant $40,000 of it. Ali understood the money was for some sort of concert tour but said he did not ask Claimant specifics. Ali was not aware that Claimant had any criminal history and knew nothing about vacuum sealing of the money.

---

[3] Page numbers here refer to the numbers in the upper right-hand corners of the exhibit, not to individually numbered deposition pages.

5

Claimant presented evidence of promotion contracts he entered with Encore Nightclub in Kansas City in late 2014 and early 2015 relating to various events at the nightclub. Claimant testified he promoted these events and obtained performers, provided services such as doormen and security, and in exchange he collected cash entry fees from event patrons. He then paid his expenses out of the collected cash. Claimant cites invoices purportedly showing his company collected fees exceeding $10,000 for many of these events, with net profits in the first half of 2015 totaling nearly $150,000. (Def. Exhs. 605-615.)

Ruben Romero lives in Denver. He testified by way of deposition. He and Claimant became mutual Facebook friends. Romero said Claimant proposed putting together a 12-city tour, with Romero booking artists and Claimant lining up the nightclubs and venues. Romero was a musician who had a business called EnV Entertainment that he formed to sell his own music CDs. Romero's CDs "flopped," however, and he lost money. The company was dormant as of May 12, 2015. Romero said he talked to "a couple of managers" about a possible tour. EnV Entertainment had no bank account as of May 2015 and had filed no tax returns because it had no income. Romero had never organized a concert tour before. Romero testified that Claimant said he only deals in cash.

Claimant testified that he was investing in a 12-city tour that he believed Romero had already put together. By contrast, Romero testified he had "no idea" of what 12 cities would be chosen, as he said it was Claimant's role to line up venues. According to Romero, the figure of approximately $140,000 for the tour that he and Claimant talked about was just Romero's "rough ballpark estimate" and "spit-balling a number" of what the tour would cost to put on. Claimant and Romero had no written agreement of any kind. In 2016, about nine months after the money was seized, Claimant emailed Romero and asked him to provide a copy of what their contract "was supposed to have been." Romero drafted and sent back a "basic outline of what it [the contract]

6

was going to be." (Def. Exh. 601, Att. B.) Romero has a prior felony conviction in Colorado relating to marijuana, for which he spent 18 months in prison, and admits to occasionally using marijuana, although he denies selling it.

Claimant's federal tax return for 2011 shows he reported just over $19,000 in adjusted gross income. (Govt. Exh. 5-4.) For 2012, he reported adjusted gross income of just over $12,000. (Govt. Exh. 5-5.) In 2013, he reported just under $18,000. (Govt. Exh. 5-6.) In 2014, he initially reported adjusted gross income of about $17,000. Sometime after the May 2015 seizure of $144,780 from his car, Claimant was referred by Mustafa Ali to accountant Connie Neighbors. Neighbors helped Claimant file an amended federal tax return that reported over $95,000 in adjusted gross income for the year 2014, including over $45,000 in business net income. (Govt. Exh. 6-3.) Neighbors also helped Claimant file his federal tax return for 2015, in which he reported adjusted gross income of over $114,000, and business net income of over $89,000. (Govt. Exh. 6-4.)

Claimant was convicted of a federal cocaine offense in approximately 1996 and spent time in prison. His supervised release for that offense was later revoked. In his deposition, Claimant explained that the revocation occurred after marijuana was found in his car and a passenger blamed it on Claimant, although Claimant denied knowing about the marijuana and was not prosecuted for it. (Govt. Exh. 5 at 70-72.) When Claimant was asked at trial about initially reporting only $17,000 on his federal tax return for 2014, Claimant said that figure was "correct but it wasn't accurate." When asked to explain, he indicated that he decided to "get … on the right track" and report the cash income from his business.

The court finds Claimant's explanation that he intended to use the $144,780 to invest in a musical tour is not credible. There are a number of reasons for this, including but not limited to

7

the following. First, it is doubtful that a large sum of cash like this would be used to fund a legitimate musical tour. Legitimate businesses would typically use checks, bank transfers, and bank accounts to move such sums, and the transactions would ordinarily be documented. *See United States v. Hernandez-Lizardi*, 530 F. App'x 676, 684 (10th Cir. 2013) ("large quantities of cash are strongly probative of participation in drug distribution"); *United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles…."). In his deposition, when asked whether promoters deal in cash or in checks and bank drafts, Claimant indicated that every deal was different but this one "was the first time it was a cash deal," and that it was done that way because Romero asked for cash. (Govt. Exh. 4 at 38.) Claimant's and Romero's explanations for the cash were contradictory, with Romero indicating it was Claimant's idea because Claimant said "he deals with cash," (Govt. Exh. 7 at 7), while Claimant said it was Romero's idea. Claimant's additional explanation that the world of rap music typically operates with cash was unsupported by credible evidence and was equally unpersuasive under the specifics of this supposed deal. Romero's testimony shows the tour idea was little more than a concept (or perhaps more accurately, a pretext), with no artists, venues, dates, locations (aside from Kansas City) or other details agreed to between Romero and Claimant. There was certainly no evidence that anything had been lined up. Yet Claimant asserted in his deposition that Romero had "supposedly … got everything situated" on March 11, 2015, and so the trip on the 12th "was a hurry up deal but it was already being put together" by Romero. (Govt. Exh. 5 at 48.) Claimant's and Romero's testimony thus conflicted on major points like whether Romero had already put a tour together or whether Claimant was supposed to come up with the venues and cities for the tour. Common sense suggests a legitimate small business operator would not likely drive from Kansas

City to Denver with $144,780 in cash to drop it off with a social media acquaintance, for a tour that neither one of the principals knew much of anything about. That explanation is particularly questionable given that Romero had no experience funding or promoting a tour of this sort. The two principals clearly had very little communication about a tour before Claimant headed to Colorado. They had no documentation or contract at the time and no concrete plans of any sort.

Claimant's explanation that he was carrying the money to invest in a tour was also undermined by his lack of credibility generally. His answers to numerous questions at trial were evasive or non-responsive. Claimant showed little inclination to accept responsibility for any of his actions. After being stopped for speeding, Claimant promptly lied to McCord about the purpose of his trip, falsely telling McCord he was going to Colorado for a vacation with family. Claimant's tax returns also support an inference that he misled the IRS about his income, as he initially reported only about $17,000 in income for 2014, but amended his 2014 return to show about $95,000 in income after being found in possession of the $144,780. Claimant suggested the amendment was due to a simple desire to operate his business cleanly, but a more likely explanation is that he was concerned about discovery of illegitimate activities and felt compelled to declare more income after being found in possession of a large amount of cash. Also undermining the credibility of Claimant's testimony was the fact that he vacuum-sealed the alleged investment money. One obvious reason for doing that, as indicated by Trooper Gray's testimony, would be to avoid detection of the money by a drug-sniffing dog. Claimant asserted that it was "very common to vacuum seal your money" in the music business, but the totality of circumstances suggests the former explanation – avoiding detection - was the more likely one for Claimant's behavior. For these reasons and others, the court finds Claimant was not a credible witness with respect to the asserted purpose of the money and the trip.

Courts have recognized that the following circumstances can give rise to or contribute, to some degree, to a reasonable inference of criminal activity and/or drug trafficking: large sums of cash (*United States v. Thompson*, 881 F.3d 629, 633 (8th Cir. 2018)); an implausible cover story (*United States v. Castillo*, 713 F.3d 407, 411 (8th Cir. 2013)); implausible travel plans including traveling a long distance only to stay one night at a destination (*United States v. Latorre*, 893 F.3d 744, 751 (10th Cir. 2018)); criminal history (*Id.* at 752); bundling and transporting money in vacuum-sealed bags (*United States v. Burkley*, 513 F.3d 1183, 1189 (10th Cir. 2008; *United States v. $252,300 in U.S. Currency*, 484 F.3d 1271, 1275 (10th Cir. 2007)); and lying to officers (*Teague v. Overton*, 15 F. App'x 597, 601 (10th Cir. 2001)). Most of the foregoing decisions address whether the totality of circumstances in a particular case give rise to a reasonable suspicion of criminal activity. In the instant case, the court has considered the evidence relating to the above factors, as well as the remaining evidence, and finds it shows by a preponderance that the $144,780 in Claimant's car was intended to be furnished by Claimant in exchange for a large quantity of marijuana or other controlled substances, which he then planned to distribute, in violation of the Controlled Substances Act.

A primary factor supporting this conclusion is the implausibility of Claimant's explanation that he was driving to Denver to leave a backpack full of cash with a social media acquaintance for a non-existent tour. Other evidence supporting an inference that Claimant intended to use the money for such an illicit purpose includes Claimant's lie to the Trooper at the time of the stop about his reason for going to Colorado, the large amount of cash involved, the fact that Claimant vacuum-sealed the cash, and Claimant borrowing $40,000 cash from a business acquaintance under an extraordinary promise to repay the principal with 50% interest in two months. When considered with other evidence, including the fact that Claimant had residue of marijuana in his

car at the time of the stop, and that both Claimant and Romero had prior felony convictions for drug trafficking offenses, the court finds that Claimant likely possessed the $144,780 with the intent to furnish it to Romero and/or others in exchange for a substantial quantity of controlled substances, so that Claimant or others could distribute the substances.

On the other hand, Plaintiff has failed to show by a preponderance that the $144,780 itself constituted proceeds traceable to an exchange for controlled substances. Claimant's tax returns raise some concern about whether the cash actually came from his entertainment business and from a loan, as he claimed, but Claimant's explanation of the source of the cash was at least plausible under the evidence presented. For that reason, the court attaches no real significance to the alert of Jaxx indicating an odor of controlled substances on the money. Indeed, Trooper Gray, the dog handler, testified that Jaxx might have alerted to the cash if even one bill in the stack was tainted with the smell of controlled substances. Although such an alert might be probative in other circumstances, evidence indicating that the cash could have been collected from thousands of individuals at a night club weakens any inference that the alert shows the money constituted proceeds traceable to a drug trafficking exchange. *Cf. United States v. Kitchell*, 653 F.3d 1206, 1222 (10th Cir. 2011) (noting question of whether large percentage of circulated currency is tainted by contact with controlled substance, but finding alert was sufficient for probable cause). Nevertheless, for the reasons indicated previously, Claimant's packaging of the money, the circumstances of his trip, and the other evidence previously discussed shows that Claimant likely intended to use the money to exchange it for controlled substances.

**III. Conclusion**

The court determines the United States is entitled to forfeiture of Defendant $144,780.00 in United States currency, pursuant to 21 U.S.C. § 881(a)(6). The court further finds that Claimant Nathan Duckworth has no property right in the currency; his claim to the same is denied.

The foregoing Memorandum and Order constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). Plaintiff may submit a form of judgment to the court consistent with the foregoing findings.

IT IS SO ORDERED this 27th day of August, 2018.

s/John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE